**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHENIKKA N. PEEPLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:08CV00964 HEA(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Shenikka N. Peeples for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 10). Defendant has filed a Brief in Support of the Answer. (Doc. No. 12). Plaintiff has also filed a Reply to Defendant's Brief in Support of the Answer (Doc. No. 13), to which defendant has filed a Sur-Reply (Doc. No. 16).

## Procedural History

On January 23, 2006, plaintiff filed her application for benefits, alleging that she became unable to work due to her disabling condition on September 15, 2004. (Tr. 76-85). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated June 18, 2007. (Tr. 9-23). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on May 30, 2008. (Tr. 4, 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A.    **ALJ Hearing**

Plaintiff's administrative hearing was held on April 18, 2007. (Tr. 25). Plaintiff was present and was represented by counsel. (Id.). Vocational expert Jeff McGrowski was also present. (Id.). The ALJ began the hearing by admitting a number of exhibits into the record. (Id.).

The ALJ then examined plaintiff, who testified that she was 24 years of age, and attended school through the ninth grade. (Tr. 26). Plaintiff stated that she had difficulties with her school work, but she did not take special education classes. (Id.). Plaintiff indicated that, although her teachers offered extra help, she did not want to be in the special education program. (Id.). Plaintiff testified that she attempted to earn a GED when she was about 22 years of age, but failed the exam. (Id.). Plaintiff stated that she passed the reading portion of the GED exam only. (Tr. 27).

Plaintiff testified that, at the time of the hearing, she was working approximately ten hours a week at Genesis In-Home Care as a home health aide, and was prevented from working more hours because she lacked the skills necessary to care for special needs patients. (Tr. 27). Plaintiff stated that she is paid $6.50 an hour at this position. (Tr. 28).

Plaintiff testified that she worked as a cashier at Taco Bell from approximately 2000 to 2004. (Id.). Plaintiff stated that she also worked for MCI as a telephone representative assisting customers with their telephone bills for about seven months. (Id.). Plaintiff testified that she had also worked at other fast food restaurants since she left school, including McDonald's and Subway. (Tr. 29).

Plaintiff testified that she has a two-year-old child. (Id.). Plaintiff stated that her mother and grandmother help care for plaintiff's child. (Tr. 29). Plaintiff testified that the child's father does not participate in caring for the child. (Id.).

Plaintiff testified that she sees Dr. Layla Ziaee once a month for treatment of her anxiety and depression. (Tr. 29-30). Plaintiff stated that she started seeing Dr. Ziaee in December of 2006, and that she has seen Dr. Ziaee four to five times. (Tr. 30). Plaintiff testified that she had last seen Dr. Ziaee the month prior to the hearing. (Id.). Plaintiff stated that her anxiety and depression affect her thinking and comprehension, and cause her to feel nervous. (Id.).

Plaintiff testified that she was five feet, four inches tall, and weighed 180 pounds at the time of the hearing. (Id.). Plaintiff stated that her normal weight is 150 pounds. (Id.).

Plaintiff testified that she experiences back pain, which prevents her from working full-time. (Id.). Plaintiff stated that she sought treatment for her back pain at People's Clinic in January of 2007. (Tr. 31). Plaintiff testified that the physician at People's Clinic did not take an x-ray of her back, but did prescribe medication of some type. (Id.). Plaintiff stated that she has not returned to People's Clinic nor attempted to schedule another appointment at People's Clinic since her visit in January of 2007. (Tr. 32).

Plaintiff's attorney then examined plaintiff, who stated that her mother and grandmother

help care for plaintiff's baby.  (Id.).  Plaintiff testified that she lives with her mother and

grandmother most of the time, but she also has her own apartment.  (Id.).  Plaintiff stated that she

spends most nights at her mother's house.  (Id.).  Plaintiff testified that she goes grocery shopping

with her grandmother and does not go by herself because she would not know the proper types of

groceries to purchase.  (Tr. 32-33).  Plaintiff stated that she sometimes handles her mail and

paperwork alone, but requires the assistance of her mother if she has difficulties filling out forms.

(Tr. 33).  Plaintiff acknowledged that she can read, but indicated that she has trouble

remembering most of what she has read.  (Id.).

Plaintiff testified that she socializes with friends every once in a while in the form of going

to watch a movie or going out to eat.  (Id.).  Plaintiff stated that the last time she socialized in this

manner was a couple of months prior to the hearing.  (Id.).

Plaintiff testified that Genesis In-Home Care has not offered to train her as a certified

nursing assistant (CNA).  (Tr. 34).

The ALJ then examined vocational expert Dr. Jeff McGrowski, who testified that a

hypothetical claimant of plaintiff's age, education and work experience, who had no physical

limitations, but who could understand, remember, and carry out simple instructions; perform non-

detailed tasks; respond appropriately to supervisors and coworkers in a task-oriented setting with

only casual and infrequent contact with others; adapt to simple and routine changes in the work

setting; and take appropriate caution to avoid hazards would be unable to return to any of

plaintiff's past relevant work.  (Id.).  Dr. Magrowski testified that such an individual could

perform work as a stocker (DOT code 789.687-034) (2,000 Missouri jobs; 100,000 jobs

nationally) and cleaner (DOT code 323.687-014) (2,000 Missouri jobs; 200,000 jobs nationally).

(Tr. 36).

The ALJ next presented an exhibit to Dr. Magrowski in which psychological limitations were noted. (Tr. 35). Dr. Magrowski testified that an individual with the limitations set out in the exhibit would be unable to return to any of plaintiff's past work or any other work. (Tr. 35-36). Dr. Magrowski stated that his testimony was consistent with the DOT and his experience. (Tr. 36).

## B.      Relevant Medical Records

The record reveals that plaintiff presented to Barnes Jewish Hospital from September 7, 2004, to July 12, 2005, for care relating to a pregnancy. (Tr. 176-190).

Plaintiff presented to Cherie Baetz-Davis, Ph.D., on August 25, 2005. (199-200). Plaintiff reported being withdrawn from family and friends, overeating, and having thoughts that people were staring at her or saying things about her. (Tr. 199). Plaintiff indicated that she dropped out of high school in the tenth grade because she was unable to concentrate. (Id.). Plaintiff reported that she attempted to obtain her GED but was not confident with math. (Id.). Plaintiff indicated that she was laid off from her position at MCI for not handling calls correctly, and that she received unemployment for a year. (Tr. 200). Dr. Baetz-Davis diagnosed plaintiff with major depression,[1] rule out paranoid personality or social anxiety. (Id.). Dr. Baetz-Davis recommended that plaintiff follow-up with her primary care physician and continue with therapy. (Id.). Plaintiff was scheduled for a follow-up appointment the following week, but failed to attend

---

[1]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's Medical Dictionary, 515 (28th Ed. 2006).

the appointment. (Tr. 199).

Plaintiff presented to Jodie Warsing, M.S.N. on September 7, 2005. (Tr. 193-95). Plaintiff complained of worsening symptoms of depression such as a general lack of interest, inability to concentrate, crying spells, and a lack of enjoyment in activities. (Tr. 193). Plaintiff reported that she had dropped out of school in the tenth grade because she was unable to get up in the morning. (Tr. 194). Ms. Warsing noted that plaintiff's appearance was disheveled, her mood was depressed, and her affect was flat. (Id.). Plaintiff reported poor concentration and poor focus. (Id.). Ms. Warsing diagnosed plaintiff with major depression and assessed a GAF score[2] of 46.[3] (Tr. 195). Ms. Warsing prescribed Lexapro[4] and Trazodone,[5] and recommended individual therapy. (Id.)

Plaintiff saw Albert Dupree, Ph.D. on March 27, 2006, for a consultative examination in connection with her application for disability benefits. (Tr. 201-208). Plaintiff's chief complaint was, "I have trouble learning things on the job" and that she gets nervous when dealing with people at work. (Tr. 202). Dr. Dupree noted that plaintiff was cooperative during the interview,

---

[2]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[3]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" DSM-IV at 32.

[4]Lexapro is indicated for the treatment of major depressive disorder. See Physician's Desk Reference (PDR), 1190 (61st Ed. 2007).

[5]Trazodone is an antidepressant indicated for the treatment of depression. See PDR at 3296.

had a positive attitude, was a good historian, and smiled a lot. (Id.). Plaintiff indicated that she

had seen a psychiatrist, who prescribed medication, but she never had the medication filled. (Tr.

203). Plaintiff stated that she only saw a psychologist once because she did not want to be on any

medications. (Id.). Plaintiff reported that she was on no medication at that time and that she felt

better. (Id.). Plaintiff indicated that she dropped out of school because she did not study, as

opposed to an inability to pass her courses. (Tr. 204). Plaintiff stated that she was never

evaluated for specific learning deficits. (Id.). Plaintiff reported that she slept most of the day

while her mother took care of her daughter, and that plaintiff took care of her daughter in the

evenings. (Id.). Dr. Dupree described plaintiff's mood as euthymic and her affect as bright. (Tr.

205). Dr. Dupree noted that plaintiff was able to complete single digit calculations, but had

difficulty with 8x8 and 24/6. (Id.). Dr. Dupree found that plaintiff was mildly impaired in her

ability to complete simple tasks in a timely manner over a sustained period of time from a

psychological point of view. (Tr. 206). He expressed the opinion that plaintiff was moderately

impaired in social functioning due to excessive sleeping, although he noted that plaintiff maintains

a friendship form the ninth grade and goes out to a bar with this friend. (Id.). Dr. Dupree found

that plaintiff's ability to care for her personal needs and activities of daily living were intact. (Id.).

Dr. Dupree diagnosed plaintiff with depressive disorder not otherwise specified, in partial

remission; and personality disorder not otherwise specified with avoidant and dependent features;

and assessed a GAF score of 63.[6] (Id.) Dr. Dupree concluded that plaintiff should be able to

---

[6]A GAF score of 61-70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social occupational or school functioning (e.g., occasional truancy, or theft within household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

sustain concentration and persistence in tasks and that her ability to interact socially and

adaptively was not impaired from a psychological standpoint. (Tr. 207). Dr. Dupree noted that,

although plaintiff's math skills were rudimentary, she had paid bills when she had a job and there

is nothing in her history which mitigates against her ability to handle her own finances. (Tr. 207).

Dr. Dupree stated that plaintiff's prognosis was guarded, due primarily to plaintiff's unwillingness

to receive treatment, and secondarily to the enabling of plaintiff's mother. (Tr. 206).

Aine Kresheck, Ph.D. completed a Psychiatric Review Technique on April 18, 2006, in

which she evaluated plaintiff's condition beginning on August 1, 2005. (Tr. 209-22). Dr.

Kresheck found that plaintiff suffered from major depression, which did not satisfy diagnostic

criteria. (Tr. 212). Dr. Kresheck expressed the opinion that plaintiff had mild limitations in her

activities of daily living, ability to maintain social functioning, and ability to maintain

concentration, persistence, or pace. (Tr. 219). Dr. Kresheck found that plaintiff had never

experienced an episode of decompensation of an extended duration. (Id.). Dr. Kresheck stated

that plaintiff appears only mildly limited by her mental impairment, and that plaintiff's condition

could be further improved with treatment and medical compliance. (Tr. 221).

Dr. Kresheck completed another Psychiatric Review Technique on May 1, 2006, in which

she evaluated plaintiff's condition beginning September 15, 2004. (Tr. 223-35). Dr. Kresheck

found that there was insufficient evidence for this period of adjudication, noting that the first

evidence of a mental impairment was from August 25, 2005. (Tr. 235).

On December 13, 2006, plaintiff presented to Dr. Layla Ziaee, with complaints of feeling

depressed. (Tr. 262). Dr. Ziaee noted that plaintiff's mood was depressed. (Tr. 263). Dr. Ziaee

diagnosed plaintiff with major depressive disorder and assessed a GAF score of 45. (Id.). Dr.

Ziaee prescribed Effexor,[7] and recommended a follow-up visit in one month.  (Id.).

Plaintiff presented to Dr. Ziaee for a follow-up on January 26, 2007.  (Tr. 261).  Plaintiff reported feeling less depressed and less anxious, but reported continued problems sleeping and problems with social anxiety.  (Id.).  Dr. Ziaee continued plaintiff's Effexor and prescribed Trazodone.  (Id.).

On March 14, 2007, Dr. Ziaee completed a Medical Source Statement, in which she indicated that she had seen plaintiff three times and had diagnosed plaintiff with depression with anxiety.  (Tr. 257-60).  Dr. Ziaee expressed the opinion that plaintiff was markedly impaired in her ability to relate in social situations; interact with the general public; maintain socially acceptable behavior; understand and remember simple instructions; make simple work-related decisions; maintain attention and concentration for extended periods and perform at a consistent pace without an unreasonable number and length of rest periods; and work in coordination with others.  (Tr. 258).  Dr. Ziaee found that plaintiff was moderately impaired in her ability to cope with normal work stress; function independently; behave in an emotionally stable manner; maintain reliability; accept instructions and respond to criticism; maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from symptoms; sustain an ordinary routine without special supervision; and respond to changes in work setting.  (Tr. 257-58).  Dr. Ziaee indicated that plaintiff had experienced one or two episodes of decompensation.  (Tr. 259).  Dr. Ziaee found that plaintiff had a substantial loss of the ability to understand, remember, and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work; and respond appropriately to supervision, co-workers, and

_____

[7]Effexor is indicated for the treatment of major depressive disorder.  See PDR at 3412.

usual work situations. (Id.). Dr. Ziaee concluded plaintiff's limitations had existed at the assessed severity since December 13, 2006, and that plaintiff's limitations had lasted or could be expected to last 12 months. (Id.).

On April 11, 2007, plaintiff was evaluated by Martin Rosso, Ph.D., upon the referral of the state agency. (Tr. 264-270). Plaintiff's evaluation consisted of a clinical interview and the administering of the Wechlser Adult Intelligence Scale-III (WAIS-III). (Tr. 264). Testing revealed a full scale IQ of 65,[8] which Dr. Rosso noted was in the mentally deficient range. (Tr. 269). Dr. Rosso stated that plaintiff demonstrated below average verbal, nonverbal cognitive abilities, reasoning, and problem solving. (Id.). He stated that despite plaintiff's limited IQ, she has adequate judgment to manage her funds. (Id.). Dr. Rosso found that plaintiff would have difficulty performing any job that required adaptation and higher level problem solving, although she was intellectually capable of repetitive simple jobs. (Id.). With regard to plaintiff's depression and anxiety, Dr. Rosso noted that plaintiff appeared depressed but no abnormal anxiety was noted. (Id.). Dr. Rosso indicated that plaintiff reported that she felt nervous around others and felt that they were staring at her before she began taking medication. (Id.). Dr. Rosso stated that plaintiff reported improvement with medication, but she had not been taking her medication for the prior two weeks due to an alleged inability to afford the refills. (Id.). Dr. Rosso concluded that plaintiff's limited intellectual ability and her psychiatric condition of depression and anxiety impact her ability to function in most jobs. (Id.). Dr. Rosso diagnosed plaintiff with major depressive disorder, social anxiety, mild mental retardation, and noted that plaintiff exhibited

---

[8]Mild Mental Retardation is characterized by an IQ score of 50 -55 to approximately 70. See DSM IV at 40.

serious symptoms in occupational functioning.  (Tr. 270).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act
        through June 30, 2007.

2.      The claimant has not engaged in substantial gainful activity since September 15,
        2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b)
        and 416.971 et seq.).

3.      The claimant has the following severe impairments: major depressive disorder and
        a personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that
        meets or medically equals one of the listed impairments in 20 CFR Part 404,
        Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),
        416.925 and 416.926).

5.      Functionally the claimant has no physical limitations and can understand,
        remember and carry out at least simple instructions and non-detailed tasks,
        demonstrate adequate judgment to make adequate simple work related decisions,
        respond appropriately to supervisors and coworkers in task oriented setting where
        contact with others is casual and infrequent, adapt to simple routine work changes
        and take appropriate precautions to avoid hazards.

6.      The claimant cannot perform any past relevant work (20 CFR 404.1565 and
        416.965).

7.      The claimant was born on September 23, 1982 and was 21 years old, which is
        defined as a younger individual age 18-44, on the alleged disability onset date (20
        CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20
        CFR 404.1564 and 416.964).

9.      There is no evidence documenting transferable skills.

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 15, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## Discussion

**A.    Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059

(8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required

is now documented in the decision of the ALJ or Appeals Council.  <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  <u>See</u> <u>id.</u>  Next, the Commissioner must determine the severity of the impairment based on those ratings.  <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  <u>See</u> <u>id.</u>  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); <u>Jones v. Callahan</u>, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

**C.  Plaintiff's Claims on Appeal**

Plaintiff raises three claims on appeal of the Commissioner's decision.  First, plaintiff argues that the ALJ's determination of plaintiff's residual functional capacity was improper, in that the ALJ failed to give proper weight to the opinion of plaintiff's treating physician, Dr. Ziaee, regarding plaintiff's mental impairment.  Plaintiff next argues that the ALJ improperly rejected Dr. Rosso's assessment of mild mental retardation.  Plaintiff finally contends that the ALJ erred in failing to re-contact Drs. Ziaee and Rosso.  The undersigned will address plaintiff's claims in turn.

**1.  Residual Functional Capacity**

Plaintiff claims that, in assessing plaintiff's residual functional capacity, the ALJ improperly weighed the opinion of plaintiff's treating physician, Dr. Layla Ziaee.  Defendant argues that the ALJ's residual functional capacity determination is supported by substantial evidence in the record.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "Ordinarily, a treating physician's opinion should be given substantial weight."  Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)).  Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original).  Such opinions, however, do "not automatically control, since the record must be evaluated as a

whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may

be discounted or disregarded where other "medical assessments 'are supported by better or more

thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little,

the ALJ is required to give good reasons for the particular weight given the report. See

Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). If the opinion of a treating

physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1)

the length of the treatment relationship and the frequency of examination, (2) the nature and

extent of the treatment relationship, including the treatment provided and the kind of examination

or testing performed, (3) the degree to which the physician's opinion is supported by the relevant

evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the

physician is a specialist in the area upon which opinion is rendered, and (6) other factors which

may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. §

404.1527 (d)(2)-(6).

On March 14, 2007, Dr. Ziaee completed a Medical Source Statement, in which she

expressed the opinion that plaintiff was markedly impaired in her ability to relate in social

situations; interact with the general public; maintain socially acceptable behavior; understand and

remember simple instructions; make simple work-related decisions; maintain attention and

concentration for extended periods and perform at a consistent pace without an unreasonable

number and length of rest periods; and work in coordination with others. (Tr. 258). Dr. Ziaee

found that plaintiff was moderately impaired in her ability to cope with normal work stress;

function independently; behave in an emotionally stable manner; maintain reliability; accept

instructions and respond to criticism; maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from symptoms; sustain an ordinary routine without special supervision; and respond to changes in work setting. (Tr. 257-58).

The undersigned finds that the ALJ did not err in assigning little weight to Dr. Ziaee's opinion. The ALJ properly based and explained his decision to assign little weight to the opinion of Dr. Ziaee on the required factors. The ALJ noted that, although Dr. Ziaee did see plaintiff for treatment, only three visits appear in the record. (Tr. 262, 261, 257). The ALJ properly cited this as a factor relevant in the weighing of Dr. Ziaee's opinion.

The ALJ also found that Dr. Ziaee's opinion is not supported by Dr. Ziaee's own treatment notes. Dr. Ziaee noted during her second examination of plaintiff on January 26, 2007 that plaintiff was well-dressed and groomed, plaintiff's speech had a regular rate and rhythm, and her flow of thought was logical and sequential. (Tr. 261). Plaintiff did not exhibit any psychosis, suicidal ideation, or homicidal ideation. (Id.). In fact, Dr. Ziaee noted that plaintiff's affect was "better." (Id.). Dr. Ziaee's treatment notes coincide with plaintiff's own reports that she felt less depressed, had fewer crying spells, and was less anxious. (Id.). Dr. Ziaee's records suggest that plaintiff was responding quite favorably to treatment. Dr. Ziaee's conclusions regarding plaintiff's inability to perform simple, unskilled work are not substantiated by her own records.

The ALJ also properly found that Dr. Ziaee's opinion was inconsistent with the record as a whole. Dr. Ziaee was the only physician to express the opinion that plaintiff was unable to perform simple, unskilled work. Dr. Rosso found that plaintiff was capable of performing repetitive simple jobs. (Tr. 269). Dr. Dupree concluded that plaintiff should be able to sustain concentration and persistence in tasks and that her ability to interact socially and adaptively was

not impaired. (Tr. 207). Dr. Kresheck found, based on a review of the record, that plaintiff was only mildly limited by her mental impairment. (Tr. 221).

When plaintiff presented to Drs. Davis, Warsing, and Ziaee, it was noted that she was not taking any psychological medications. (Tr. 199, 193, 262). Plaintiff's presentation to Dr. Davis in August of 2005 was the first instance in which plaintiff sought medical assistance for any psychological problems. After using medication prescribed by Dr. Ziaee for one month, plaintiff reported less depression, fewer crying spells, and less anxiety in public places. (Tr. 261). These favorable results are consistent with the opinion of the consulting psychiatrist that if plaintiff becomes clinically depressed again, counseling and medication should be utilized to treat the symptoms. In fact, most of the physicians involved in treating, examining or reviewing plaintiff's case noted substantial improvement if plaintiff began using prescribed medication or noted that plaintiff's failure to properly utilize her prescribed medication negatively affected her prognosis. The record as a whole does not support Dr. Ziaee's opinion that plaintiff's condition is severe to such a degree that she is unable to perform simple, unskilled work.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> Based on all of the above, the claimant's allegations of completely disabling symptoms and limitations lasting or expected to last for at least 12 continuous months are not persuasive. It is found that the claimant can understand, remember and carry out at least simple instructions and non-detailed tasks, demonstrate adequate judgment to make adequate simple work related decisions, respond appropriately to supervisors and coworkers in task oriented setting where contact with others is casual and infrequent, adapt to simple routine work changes and take appropriate precautions to avoid hazards. She has no medically determinable impairments that limit her ability to engage in exertional or physical work activities.

(Tr. 17).

The ALJ's residual functional capacity determination is supported by substantial evidence. As discussed above, the objective medical evidence supports the ALJ's finding that plaintiff was capable of performing a limited range of simple work. Specifically, the ALJ's determination is consistent with the opinions of Drs. Dupree, Kresheck, and Rosso.

In determining plaintiff's residual functional capacity, the ALJ also performed a proper credibility analysis, and concluded that plaintiff's subjective complaints were not entirely credible. (Tr. 14). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of non-exertional impairments, the ALJ

is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The ALJ properly weighed plaintiff's credibility in formulating her RFC. The ALJ accurately noted that plaintiff has received very little psychiatric treatment. (Tr. 15). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ also pointed out that plaintiff has failed to follow-up with treatment or medication. (Tr. 15). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

Upon presentation to Dr. Warsing on September 7, 2005, plaintiff reported no previous psychiatric treatment, no prior hospitalizations, and no previous medications in regards to psychiatric treatment. (Tr. 193). Plaintiff failed to attend a follow-up appointment with Dr. Baetz-Davis. (Tr. 199). During a March 27, 2006 consultative examination with Dr. Dupree, plaintiff reported that she had only been to a psychologist once (Dr. Warsing), she had never taken the psychiatric medication prescribed by Dr. Warsing, and she refused to take any psychiatric medication prescribed by Dr. Dupree. (Tr. 201-08). The ALJ pointed out that, although plaintiff testified that she had presented to Dr. Ziaee four or five times, Dr. Ziaee noted that she had only seen plaintiff for three visits. (Tr. 16, 259). The ALJ noted that, throughout most of the period at issue, plaintiff has not received any mental health treatment and has not taken psychiatric medication. (Tr. 15). The ALJ properly found that plaintiff's sporadic

treatment and failure to comply with treatment detracted from the credibility of her allegations of a disabling mental impairment.

The ALJ also noted that plaintiff received unemployment benefits for a year after she stopped working in September of 2004. (Tr. 15). The application for unemployment benefits requires an assertion of the ability to work and is facially inconsistent with a claim of disability. Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994). As such, the ALJ properly found that plaintiff's receipt of unemployment benefits was inconsistent with her allegations that she was unable to work due to disability. (Tr. 15).

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this claim.

## 2.   Dr. Rosso's Diagnosis of Mild Mental Retardation

Plaintiff argues that the ALJ improperly rejected Dr. Rosso's assessment of mild mental retardation based on the results of a clinical interview and the Wechlser Adult Intelligence Scale-III test.

In finding that plaintiff did not meet listing 12.05 for mental retardation, the ALJ noted inconsistencies between plaintiff's daily activities and behavior and Dr. Rosso's finding of mild mental retardation. (Tr. 16). With respect to Dr. Rosso's opinion, the ALJ noted the following:

> [r]egarding the opinion evidence, it was already noted that Dr. Rosso was not a treating source, only saw her for once for compensation purposes and that his diagnosis of mild mental retardation was not consistent with the claimant's activities of daily living, employment history or the report of any other examining or treating medically acceptable source.

(Tr. 16).

The Commissioner is not required to accept a claimant's IQ scores, and may reject scores

that are inconsistent with the record. See Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). "Indeed, test results of this sort should be examined 'to assure consistency with daily activities and behavior.'" Id. (quoting Popp v. Heckler, 779 F.2d 1479, 1499 (11th Cir. 1986) (per curiam)). The appropriate question is whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole. See id.

The ALJ properly noted that IQ scores, standing alone, are not determinative of whether plaintiff is mentally retarded. Further, the ALJ cited numerous reasons for concluding that a finding of mild mental retardation was not consistent with the daily activities and behavior of plaintiff. Although plaintiff claims that she intentionally averted using the public school system's special education resources to avoid being labeled with a mental impairment, it is significant that there are no school records documenting that plaintiff exhibited mild mental retardation or any other mental or learning disability while in the public school system. Plaintiff has also engaged in substantial periods of gainful employment in the past. The ALJ noted that plaintiff worked as a telephone representative and as a cashier from 2001 to 2004, earning up to $11,796.00 a year. (Tr. 12). Plaintiff also admitted to living on her own and being primarily responsible for the care of her child, although plaintiff's mother helps care for the child as well. (Id.). With regard to social interaction, the ALJ noted that plaintiff goes out to the movies and restaurants. (Id.). Plaintiff also drives, shops, pays her bills, and can use a checkbook. (Id.). The undersigned finds that the ALJ properly concluded that the evidence as a whole, and not solely the IQ test, was inconsistent with a diagnosis of mild mental retardation. (Id.). While plaintiff's lower IQ scores indicate that plaintiff's level of intellectual functioning is indeed below average, this court should "not reverse the ALJ's determination simply because there is substantial

-23-

evidence supporting an opposite result." Lawrence v. Chater, 107 F.3d 674, 677 (8th Cir. 1997).

For these reasons, substantial evidence supports the ALJ's finding that plaintiff did not suffer

from mild mental retardation.

**3.      Re-contacting Drs. Ziaee and Rosso**

Plaintiff argues that the ALJ should have re-contacted Drs. Ziaee and Rosso if

inconsistencies were found in their opinions.

The Social Security regulations do not require an ALJ to re-contact a treating physician

whose opinion was contradictory or unreliable. See Hacker v. Barnhart, 459 F.3d 934, 938 (8th

Cir. 2006) (citing 20 C.F.R. § 404.1512(e)). Under the regulations, "[t]he ALJ is required to

recontact medical sources ... only if the available evidence does not provide an adequate basis for

determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir.

2004). The ALJ is not required to seek additional clarifying statements from a treating physician

unless a crucial issue is undeveloped. See Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).

It is true that the ALJ has a duty to fully develop the record, particularly where a claimant

is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). This

inquiry, however, is limited to whether the claimant was prejudiced or unfairly treated by the

ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).

"An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as

other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v.

Shalala, 51 F.3d 777, 779 (8th Cir. 1999) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir.

1994)).

In the instant case, the evidence in the record provides sufficient grounds for determining

the merits of plaintiff's disability claim. Plaintiff presented to five different physicians, a reviewing psychologist analyzed the findings of the five physicians, and a vocational expert testified at the ALJ hearing. As previously discussed, the record as a whole contains substantial medical evidence and other evidence that supports the ALJ's determination that plaintiff was not disabled. Despite any inconsistencies in the record, the ALJ did not err by failing to re-contact Dr. Ziaee or Dr. Rosso.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this claim.

## <u>RECOMMENDATION</u>

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act be **affirmed**.


The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


Dated this __4th__ day of September, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE